UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re                              )
                                   )
JEFFREY MICHAEL SCHWALM             )    Case No. 8:07-bk-4483-KRM
and JENNIFER LYNNE SCHWALM          )    Chapter 13
                                   )
         Debtors.                   )
_____    )

MEMORANDUM OPINION AND ORDER

In this Chapter 13 case, the Court must determine whether the "hanging paragraph," added to the end of Section 1325(a) in 2005, protects two "910 car" lenders from having their respective loans stripped down to the current value of each car. The debtors argue that the lenders are not entitled to that protection because they do not hold the requisite "purchase money security interest" -- their loans include (1) a roll-over of negative equity owed on cars that were traded in, (2) pre-payment of "gap" insurance to cover the difference between the new car's value and the total amount financed, and (3) pre-paid extended warranty contract premiums, which debts are said to be unrelated to the "price" of the purchased cars.

There is no controlling authority in the 11th Circuit on this issue. The emerging Bankruptcy Court and District Court

decisions are in conflict.[1] After considering the arguments and the reported decisions, I am compelled to follow the reasoning of the District Court in the Western District of New York in *GMAC v. Peaslee*, 373 B.R. 252 (W.D. N.Y. 2007), and rule for the lenders: each of these "910 car" loans is a "purchase money security interest" for purposes of Section 1325(a).

## BACKGROUND

The facts are simple and undisputed. The debtors filed a joint petition for relief under Chapter 13 on May 29, 2007. On November 13, 2005, well within the 910-day period required by the "hanging paragraph," the debtors bought two new Pontiac G6 cars for their personal use. The cars were purchased from the same dealer, using the same form of Retail Installment Contract. One car was financed by Bank of America, the other

---

[1] Cases holding that the lender does <u>not</u> hold a "purchase money security interest" where the loan includes rolled-in negative equity, gap insurance or extended warranty: *In re Blakeslee*, 377 B.R. 724 (Bankr. M.D. Fla. 2007); *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Ca. 2007); *In re Price*, 363 B.R. 734 (Bankr. E.D. N.C. 2007); *In re Barnes*, No. 13-06-11169 SA (D. N.M., 2007); *In re Peaslee*, 358 B.R. 545 (Bankr. W.D. N.Y. 2006), rev'd *GMAC v. Peaslee*, 373 B.R. 252 (W.D. N.Y. 2007); and *In re Vega*, 344 B.R. 616 (Bankr. D. Kan. 2006).

Cases holding that the lender does hold a purchase money security interest: *In re Bradlee*, No. 07-bk-30527 (W.D. La. filed October 10, 2007); *In re Wall*, 376 B.R. 769 (Bankr. W.D. N.C. 2007); *GMAC v. Peaslee*, 373 B.R. 252 (W.D. N.Y. 2007); *Graupner v. Nuvell Credit Corp.*, 2007 WL 1858291 (M.D. Ga., June 26, 2007); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D. N.Y. 2007); and *In re Turner*, 349 B.R. 437 (Bankr. D. S.C. 2006).

2

by General Motors Acceptance Corp. ("GMAC"). The debtors maintain that the total amount financed on the Retail Installment Contracts included the negative equity from their trade-ins, plus premiums for gap insurance, and the cost of an extended warranty contract.[2] In due course, the dealer assigned the contracts to the lenders.

Bank of America filed a proof of claim asserting a current balance of $27,730.78; the debtors' initial Chapter 13 plan provided for a total secured claim in favor of Bank of America of only $15,600. GMAC filed a proof of secured claim in the amount of $20,275.38; the debtors' plan provided for a total secured claim of only $15,600. The debtors have filed motions to value each vehicle consistent with the proposed Chapter 13 plan (Doc. Nos. 31 and 32).

## DISCUSSION

The debtors seek to value each car at $13,000 at 7% interest and treat each lender's claim as only partially secured, in accordance with Bankruptcy Code Section 506(a). Because this Chapter 13 case was filed after the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), the debtors' stratagem is

---

[2] GMAC disputes that any negative equity was included in its transaction.

subject to the unnumbered, and thus so-called "hanging paragraph" at the end of Section 1325(a):

> "For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing."

The debtors contend that the "hanging paragraph" does not apply -- and thus the lenders' claims can be stripped down to the respective car's values -- because neither Bank of America nor GMAC holds a "purchase money security interest." The Bankruptcy Code does not define "purchase money security interest" ("PMSI"), but the term seems to have been borrowed from what is a basic concept in Article 9 of the Uniform Commercial Code ("UCC"). The parties in this case, and all of the reported decisions, are in accord that the analysis must therefore begin with the definition of PMSI in Section 9-103 of the UCC, codified in this state as Section 679.1031, Florida Statutes. *See e.g., In re Blakeslee,* 377 B.R. 724 (Bankr. M.D. Fla. 2007); *In re Honcoop,* 377 B.R. 719 (Bankr. M.D. Fla. 2007).

4

Section 679.1031(2), Florida Statutes, provides:

> "A security interest in goods is a purchase-money security interest: (a) to the extent that the goods are purchase money collateral with respect to the collateral."

Working through the structure of Section 679.1031, *purchase-money collateral* means "goods . . . that secure a purchase money obligation incurred with respect to the collateral." Fla. Stat. § 679.1031(1)(a) (2007). A *purchase-money obligation* is --

> "an obligation . . . incurred as all or part of the *price of the collateral or for value given to enable the debtor to acquire rights in the use of the collateral. . . .*" (emphasis added)

Fla. Stat. § 679.1031(1)(b) (2007).

There is no statutory definition in the UCC of "price" or the "value given to enable," but the UCC drafters' Comment 3 to Section 679.1031, provides the following explanation:

> "[t]he 'price' of collateral or the 'value given to enable' includes *obligations incurred in connection with acquiring rights in the collateral*, sales taxes, duties, finance charges, interest freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement attorney's fees and other similar obligations."
>
> The concept of 'purchase money security interest' requires a *close nexus between the acquisition of the collateral and a secured obligation.*" (emphasis added)

5

The <u>debtors'</u> arguments are substantially the same as have been considered in prior decisions. In general, they assert that since a car can be purchased outright for roughly its sticker price plus options, tax, tag and title fees without any of the added charges at issue, the total amount financed by the lenders exceeds the vehicle's "price," as so defined. Therefore, neither lender has a PMSI for the full amount of the debt. That is essentially the holding of the bankruptcy court in *In re Peaslee*, 358 B.R. 545 (Bankr. W.D. N.Y. 2006):

> "The term 'price of the collateral,' as used in Section 9-103(a) has the same meaning that it always had in connection with transactions for the acquisition of any collateral, including a motor vehicle, which is the actual price of the collateral being acquired. The term 'price of the collateral' does not mean 'cash sale price' or any other price that may be defined or referred to in any . . . other state or federal statutes . . ., because those other statutes were not enacted . . . to define . . . [PMSI] under the [UCC]."

358 B.R. at 556.

> "[T]here are simply two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles, which is good for both parties."

*Id.* at 558. See also *In re Blakeslee,* 377 B.R. 724 (Bankr. M.D. Fla. 2007)(following the bankruptcy court's reasoning in *Peaslee*).

The <u>lenders</u> counter that the bankruptcy court's ruling in *Peaslee* was reversed, *GMAC v. Peaslee*, 373 B.R. 252 (W.D. N.Y. 2007), and that the bankruptcy court's analysis has been rejected by courts in other jurisdictions.[3] In reversing the bankruptcy court, the District Court in *Peaslee* reasoned:

> "It is not apparent why a refinancing of rolled-in negative equity on a trade in as part of a motor vehicle sale could not constitute an 'expense incurred in connection with acquiring rights in' the new vehicle. If the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an integral part of their transaction . . . it is in fact difficult to see how that could not be viewed as such an expense."

373 B.R. at 259. *See also, In re Cohrs*, 373 B.R. 107, 109-11 (Bankr. E.D. Cal. 2007); *In re Petrocci,* 370 B.R. at 499-500.

I find this reasoning persuasive. The debtors negotiated a packaged financing in compliance with the state motor

---

[3] *In re Wall*, 376 B.R. 769 (Bankr. W.D. N.C. 2007); *In re Cohrs*, 373 B.R. 107 (Bankr. E.D. Cal. 2007); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D. N.Y. 2007).

vehicle finance law, Fla. Stat. §§ 520.01 *et seq.* (2007), and the Federal Truth in Lending law, 15 U.S.C. §§ 1601 *et seq.*; Regulation Z, 12 C.F.R. § 226.18 (2007).  Under these laws, the items complained of here are lawfully permitted to be included in the "amount financed" in a motor vehicle retail installment contract.[4]  When viewed in this way, -- as a "packaged" transaction to dispose of the old car, insure the new loan amount, and provide for future maintenance -- the items included in the amount financed do have a close nexus to the acquisition of the car, consistent with the explanation of the concept of price in Comment 3 to Section 679.1031.

Technically, this Court is not being asked to define PMSI in Section 679.1031 by reference to the concept of "price" in other statutes.  I find that the doctrine of *in pari materia* could be used to harmonize the definition of PMSI to Florida's

---

[4] Florida's Motor Vehicle Sales Finance Act permits licensed sellers to offer financing of motor vehicles by contracts in which the "total sale price" is defined as the sum of (1) the "cash price" (including price of accessories, services related to the sale, service contracts, taxes, and fees for title and registration); (2) the amount required to discharge a security interest, lien or lease interest in a motor vehicle traded-in in connection with the contract; and (3) the finance charge, as defined. Fla. Stat. §§ 520.02(2), 520.07(2)(c)(2007).  The lenders also urge the Court to view the state motor vehicle finance law and federal truth-in-lending law, which recognize negative equity, gap insurance and service contracts as part of the total sales price, should be viewed being *in pari materia* with the concept of "price" in UCC Section 679.1031.

motor vehicle finance statute, but it is not necessary to conduct any further exegesis of the meaning of price.[5]

This Court actually has before it a different issue -- what is the intended effect of Congress' "borrowing" of the term "purchase money security interest" in the "hanging paragraph" of Bankruptcy Code Section 1325(a). When BAPCPA was enacted, it was already common industry practice, sanctioned by state motor vehicle finance law, and the federal truth-in-lending law, for automobile dealers to offer buyers packaged financing, which includes the payoff of debt on the trade-in vehicle, gap insurance, to protect repayment of that amount, and the cost of a service contract. These obligations, by the parties' negotiation, and sanctioned by Florida finance laws (as in other states), have the requisite "close nexus" to the acquisition of the collateral and the secured obligation as explained by Comment 3 to Section 679-1031.

It is apparent from the plain language of BAPCPA, and the caption to its House Report discussion,[6] that the "hanging

---

[5] Motor vehicles are the subject of registered certificates of title and, in Florida, the perfection, effect of perfection, and priority of a lien on a motor vehicle is governed by non-U.S.C. law. See Fla. Stat. § 679.3031 (2007).

[6] "Giving Secured Creditors Fair Treatment in Chapter 13." H.R.Rep. No. 109-31, at 72 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 140.

paragraph" was adopted to give favored treatment to a limited class of potentially under-secured creditors -- those holding a purchase money security interest in a motor vehicle acquired for personal use within the 910 days preceding the bankruptcy petition date.  11 U.S.C. § 1325(a).  The debtors' argument carries with it the implicit conclusion that Congress intended the "hanging paragraph" to be inoperative as to a substantial number of lawful auto finance transactions that were industry practice when BAPCPA was enacted.  Such an interpretation is not compelled by the text of the "hanging paragraph," or by its legislative history.

## CONCLUSIONS

The concept of "purchase money security interest" admits of two contrary interpretations as to motor vehicle loans, depending on whether the underlying premise is "sticker price plus taxes, tag and title" or "negotiated packaged financing." I conclude that "purchase money security interest," as used in Section 1325(a), only makes sense when viewed as applying to those auto financing transactions, lawful and common in industry practice when BAPCPA was adopted, in which negative equity on a trade-in, gap insurance and service contract premiums are financed.  Therefore, the Court adopts the reasoning of the District Court in *GMAC v. Peaslee* to hold

that, for purposes of the "hanging paragraph" in Section 1325(a), the two secured loans at issue here are "purchase money security interests."

AND IT IS HEREBY ORDERED:

1. The debtors' motion to value the secured claim of Bank of America (Document No. 32) is denied.

2. The debtors' motion to value the secured claim of GMAC (Document No. 31) is denied.

DONE and ORDERED in Tampa, Florida, this 16th day of January, 2008.

/s/ K. Rodney May
_____
K. RODNEY MAY
United States Bankruptcy Judge

Copies Furnished To:

Jeffrey Michael Schwalm and Jennifer Lynne Schwalm, Debtors, 3724 Penrick Drive, Holiday, Florida 34691

Jay M. Weller, Esquire, Attorney for Debtors, 18820 U.S. 19 North, Building 2, Suite 200, Clearwater, Florida 33764

Robert S. Hoofman, Esquire, Attorney for GMAC, Post Office Box 3146, Orlando, Florida 32802-3146

Victor Veschio, Esquire, Attorney for Bank of America, 3105 W. Waters Avenue, Suite 204, Tampa, Florida 33614

Terry E. Smith, Trustee, Post Office Box 6099, Sun City Center, Florida 33571